### UNITED STATES of America, Plaintiff-Appellee,

v.

### Israel BALANOVSKI, Samuel Bernardo Horenstein, Compania Argentina de Intercambio Comercial, I. Balanovski & Cia. (sometimes called "CADIC"), a copartnership, Defendants-Appellants.

### No. 369, Docket 23853.

United States Court of Appeals Second Circuit.

Argued June 4, 1956.

Decided Aug. 14, 1956.

Donald L. Stumpf, New York City (Sandow Holman, New York City, on the brief), for defendants-appellants.

Maurice N. Nessen, Asst. U. S. Atty., S. D. N. Y., New York City (Paul W. Williams, U. S. Atty., and Arthur B. Kramer, Asst. U. S. Atty., New York City, on the brief), for plaintiff-appellee.

Before CLARK, Chief Judge, and HINCKS and WATERMAN, Circuit Judges.

CLARK, Chief Judge.

This is an appeal by defendants and a cross-appeal by the United States of America from a decision of Judge Palmieri, sitting without a jury, adjudging defendant-taxpayers liable for almost $1,000,000 in income taxes and interest for the year 1947, and directing two New York banks to pay over funds belonging to the defendant partnership in part payment of the judgment. D.C. S.D.N.Y., 131 F.Supp. 898. In our view the recovery granted was insufficient, and we are therefore reversing on the appeal of the United States only.

Defendants Balanovski and Horenstein were copartners in the Argentine partnership, Compania Argentina de Intercambio Comercial (CADIC), Balanovski having an 80 per cent interest and Horenstein, a 20 per cent interest. Balanovski, an Argentinian citizen, came to the United States on or about December 20, 1946, and remained in this country for approximately ten months, except for an absence of a few weeks in the spring of 1947 when he returned to Argentina. His purpose in coming here was the transaction of partnership business; and while here, he made extensive purchases and sales of trucks and other equipment resulting in a profit to the partnership of some $7,763,702.20.

His usual mode of operation in the United States was to contact American suppliers and obtain offers for the sale of equipment. He then communicated the offers to his father-in-law, Horenstein, in Argentina. Horenstein, in turn, submitted them at a markup to an agency of the Argentine Government, Instituto Argentino de Promocion del Intercambio (IAPI), which was interested in purchasing such equipment. If IAPI accepted an offer, Horenstein would notify Balanovski and the latter would accept the corresponding original offer of the American supplier. In the meantime IAPI would cause a letter of credit in favor of Balanovski to be opened with a New York bank. Acting under the terms of the letter of credit Balanovski would assign a portion of it, equal to CADIC's purchase price, to the United States supplier. The supplier could then draw on the New York bank against the letter of credit by sight draft for 100 per cent invoice value accompanied by (1) a commercial invoice billing Balanovski, (2) an inspection certificate, (3) a nonnegotiable warehouse or dock receipt issued in the name of the New York bank for the account of IAPI's Argentine agent, and (4) an insurance policy covering all risks to the merchandise up to delivery F.O.B. New York City. Then, if the purchase was one on which CADIC was to receive a so-called quantity discount or commission, the supplier would pay Balanovski the amount of the discount. These discounts, paid after delivery of the goods and full payment to the suppliers, amounted to $858,595.90, constituting funds which were delivered in the United States.

After the supplier had received payment, Balanovski would draw on the New York bank for the unassigned portion of the letter of credit, less 1 per cent of the face amount, by submitting a sight draft accompanied by (1) a commercial invoice billing IAPI, (2) an undertaking to ship before a certain date, and (3) an insurance policy covering all risks to the merchandise up to delivery F.A.S. United States Sea Port. The bank would then deliver the nonnegotiable warehouse receipt that it had received from the supplier to Balanovski on trust receipt and his undertaking to deliver a full set of shipping documents, including a clean on board bill of lading

issued to the order of IAPI's Argentine agent, with instructions to notify IAPI. It would also notify the warehouse that Balanovski was authorized to withdraw the merchandise. Upon delivery of these shipping documents to the New York bank Balanovski would receive the remaining 1 per cent due under the terms of the letter of credit. Although Balanovski arranged for shipping the goods to Argentina, IAPI paid shipping expenses and made its own arrangement there for marine insurance. The New York bank would forward the bill of lading, Balanovski's invoice billing IAPI, and the other documents required by the letter of credit (not including the supplier's invoice billing Balanovski) to IAPI's agent in Argentina.

Twenty-four transactions following substantially this pattern took place during 1947. Other transactions were also effected which conformed to a substantially similar pattern, except that CADIC engaged the services of others to facilitate the acquisition of goods and their shipment to Argentina. And other offers were sent to Argentina, for which no letters of credit were opened. Several letters of credit were opened which remained either in whole or in part unused. In every instance of a completed transaction Balanovski was paid American money in New York, and in every instance he deposited it in his own name with New York banks. Balanovski never ordered material from a supplier for which he did not have an order and letter of credit from IAPI.

Balanovski's activities on behalf of CADIC in the United States were numerous and varied and required the exercise of initiative, judgment, and executive responsibility. They far transcended the routine or merely clerical. Thus he conferred and bargained with American bankers. He inspected goods and made trips out of New York State in order to buy and inspect the equipment in which he was trading. He made sure the goods were placed in warehouses and aboard ship. He tried to insure that CADIC would not repeat the errors in supplying inferior equipment that had been made by some of its competitors. And while here he attempted "to develop" "other business" for CADIC.

Throughout his stay in the United States Balanovski employed a Miss Alice Devine as a secretary. She used, and he used, the Hotel New Weston in New York City as an office. His address on the documents involved in the transactions was given as the Hotel New Weston. His supplier contacted him there, and that was the place where his letters were typed and his business appointments arranged and kept. Later Miss Devine opened an office on Rector Street in New York City, which he also used. When he returned to Argentina for a brief time in 1947 he left a power of attorney with Miss Devine. This gave her wide latitude in arranging for shipment of goods and in signing his name to all sorts of documents, including checks. When he left for Argentina again at the end of his 10-month stay, he left with Miss Devine the same power of attorney,[1] which she used throughout the balance of 1947 to arrange for and complete the shipment of goods and bank the profits.

When Balanovski left the United States in October 1947 he filed a departing alien income tax return, on which he reported no income. In March 1948 the

1. The power of attorney consisted of 13 paragraphs covering such topics as "Endorsement for Deposit," "Signing checks and settling accounts," "Acceptances," "Procuring Discounts," "Sale of securities," "Borrowing and giving security," "Letters of Credit," and "Contracts."
One of these paragraphs read as follows:
"(General authority and substitution)—

Give unto said attorney(s) full power and authority to do and to perform every act whatsoever requisite and convenient to be done in the premises as fully as I might do if personally present with full power of substitution and revocation, hereby ratifying all that my said attorney (s) or the substitute(s) shall do or cause to be done by virtue hereof;"

Commissioner of Internal Revenue assessed $2,122,393.91 as taxes due on income for the period during which Balanovski was in the United States. In May 1953 the Commissioner made a jeopardy assessment against Balanovski in the amount of $3,954,422.41 and gave him notice of it. At the same time a similar jeopardy assessment, followed by a timely notice of deficiency, was made against Horenstein in the amount of $1,672,209.90, representing his alleged share of CADIC's profits on the above-described sales of United States goods.

The government brought the present action to foreclose a federal tax lien on $511,655.58 and $42,529.49—amounts of partnership funds held in two United States banks—and to obtain personal judgments against Balanovski and Horenstein in the sums of $6,722,625.54 (of which $5,050,415.64 is now sought on appeal) and $1,672,209.90 respectively. Balanovski and Horenstein were served with process by mail in Argentina pursuant to 28 U.S.C. § 1655; and Miss Devine, the purported agent of Balanovski, was personally served in New York. Defendants then appeared by their attorneys and proceeded to defend the action.

### Jurisdiction of the District Court

Defendants challenge the court's jurisdiction (1) *quasi-in-rem*, because the assets levied upon were the property of the partnership, rather than of the individual taxpayers, and (2) *in personam*, because the defendants were not personally served with process and they contend that Miss Devine was not Balanovski's agent "authorized by appointment or by law to receive service of process" under F.R.C.P., rule 4(d) (1).

■ *Quasi-in-rem* jurisdiction in this case is based on enforcement of a tax lien under §§ 3670 and 3678(a) of the Internal Revenue Code of 1939. These sections permit an action *quasi-in-rem* against named defendants to recover any "property owned by the delinquent, or in which he has any right, title, or interest." This grant of jurisdiction is

sufficient to reach a partner's interest in partnership property. See Kamen Soap Products Co. v. C. I. R., 2 Cir., 230 F.2d 565; N.Y.Partnership Law, McK. Consol.Laws, c. 39, §§ 50–52; United States v. Dallas Nat. Bank, 5 Cir., 152 F. 2d 582; United States v. Dickerson, D. C.E.D.Mo., 101 F.Supp. 262. Cf. United States v. Kensington Shipyard & Drydock Corp., 3 Cir., 169 F.2d 9, 12. Whether the government can gain execution on any portion of the partnership assets is not a question of jurisdiction, but one of execution and of priority among the government, partnership creditors, and other partners. In any event, the assets here reached are partnership *profits* which are presumably not burdened by the claims of creditors.

■■ Since the defendants appeared and defended on the merits, the court acquired power to render a judgment *in personam* conditional only upon the validity of the original *quasi-in-rem* jurisdiction. The parties cannot complain of inconvenience, since they have come into the jurisdiction. They have had their day in court on the issues which would settle both the right to the funds and personal liability; there is no constitutional problem. See Blume, Actions Quasi in Rem under Section 1655, Title 28, U.S.C., 50 Mich.L.Rev. 1, 22. If the parties or if other assets are found in the United States, a rule against personal jurisdiction will only bring on further litigation, which the taxpayers will lose on the merits by collateral estoppel or *stare decisis*. Thus a rule against personal jurisdiction would be merely a mandate for further fruitless litigation. While this point has provoked some conflict, we regard the cases so agreeing as stating the better rule. Anderson v. Benson, D.C.Neb., 117 F. Supp. 765; Grant v. Kellogg Co., D.C.S. D.N.Y., 3 F.R.D. 229; Bede Steam Shipping Co. v. New York Trust Co., D.C.S. D.N.Y., 54 F.Supp. 658; Campbell v. Murdock, D.C.N.D.Ohio, 90 F.Supp. 297; 2 Moore's Federal Practice ¶ 12.13 (2d Ed. 1948). For the contrary view see

Salmon Falls Mfg. Co. v. Midland Tire & Rubber Co., 6 Cir., 285 F. 214; McQuillen v. National Cash Register Co., 4 Cir., 112 F.2d 877, certiorari denied 311 U.S. 695, 61 S.Ct. 140, 85 L.Ed. 450, rehearing denied 311 U.S. 729, 61 S.Ct. 316, 85 L.Ed. 474; Proctor v. The Sagamore Big Game Club, D.C.W.D.Pa., 128 F.Supp. 885; cf. Fahey v. O'Melveny & Myers, 9 Cir., 200 F.2d 420. F.R. 12(b), permitting the filing of objections to jurisdiction and on the merits at the same time, does not compel a contrary result; the purpose of that rule is to permit a party to challenge jurisdiction along with his other defenses and without going through the hoary ritual of entering a special appearance. There is no indication that the rule was intended to be so tortuously construed in circumstances like the present to promote unnecessary litigation.

It also seems probable that under F.R. 4(d) (1) personal jurisdiction over Balanovski and probably also over Horenstein was acquired by service of process on their agent Miss Devine. The power of attorney granted to Miss Devine by Balanovski at his departure was broad and sweeping in its terms, and an implied actual appointment to receive service of process may be readily spelled out therefrom. Cf. Cohen v. Physical Culture Shoe Co., Division of Orthopedic Shoes, D.C.S.D.N.Y., 28 F.Supp. 679, 680; Fleming v. Malouf, D.C.W.D.N.Y., 7 F.R.D. 56; Szabo v. Keeshin Motor Exp. Co., D.C.N.D.Ohio, 10 F.R.D. 275; Morfessis v. Marvins Credit, Inc., D.C. Mun.Ct.App., 77 A.2d 178; Osterling v. Commonwealth Trust Co. of Pittsburgh, D.C.W.D.Pa., 35 F.Supp. 704, affirmed 3 Cir., 115 F.2d 809. In fact Miss Devine filed a federal income tax return for Balanovski after his departure in which she described herself as his "agent." Since the applicable Regulations [2] apparently render her responsible for the filing of Balanovski's tax returns and the payment of his tax out of the funds which flowed through her hands and since she actually filed a return for Balanovski, she may be responsible for any taxes found owing on that return. All these circumstances, it seems, may result in her authorization by operation of law (in addition to her appointment in fact) to receive service of process for Balanovski in this action to collect taxes owed by him. The district court therefore has jurisdiction of this action.

### The Merits

The district court held that CADIC was not engaged in a trade or business within the United States within the meaning of § 219 of the Internal Revenue Code of 1939, but that each of the partners was liable for certain taxes because Balanovski as an individual was so engaged in business and therefore taxable under § 211(b), while Horenstein received "fixed or determinable annual or periodical gains, profits, and income" within the meaning of § 211(a) (1) (A) and (c). We, on the contrary, hold that the partnership CADIC *was* engaged in business in the United States and that hence the two copartners were taxable for their share of its profits from sources within the United States. The applicable statutes are §§ 211(b), 212, and 219 of the Internal Revenue Code of 1939.

CADIC was actively and extensively engaged in business in the United States in 1947. Its 80 per cent partner, Balanovski, under whose hat 80 per cent of the business may be thought to reside, was in this country soliciting orders, inspecting merchandise, making purchases, and (as will later appear) completing sales. While maintaining regular contact with his home office, he was obviously making important business decisions. He maintained a bank account here for partnership funds. He operated from a New York office through which a major portion of CADIC's business was transacted. See C. I. R. v. Nubar, 4 Cir., 185 F.2d 584, 588, certiorari denied 341 U.S. 925, 71 S.Ct. 796, 95 L.Ed. 1357; Fernand C. A. Adda, 10 T.C.

2. See Treas.Reg. 118, §§ 39.217-2(b) (2), 39.51-2.

273, 277, 278, affirmed per curiam Adda v. C. I. R., 4 Cir., 171 F.2d 457, certiorari denied 336 U.S. 952, 69 S.Ct. 883, 93 L.Ed. 1107; Pinchot v. C. I. R., 2 Cir., 113 F.2d 718, 719; Lewenhaupt, 20 T.C. 151, 163.

We cannot accept the view of the trial judge that, since Balanovski was a mere purchasing agent, his presence in this country was insufficient to justify a finding that CADIC was doing business in the United States. We need not consider the question whether, if Balanovski (an 80 per cent partner) were merely engaged in purchasing goods here, the partnership could be deemed to be engaged in business, since he was doing more than purchasing. Acting for CADIC he engaged in numerous transactions wherein he both purchased and sold goods in this country, earned his profits here, and participated in other activities, pertaining to the transaction of business. Cases cited in support of the proposition that CADIC was not engaged in business here are quite distinguishable. Cf. The Linen Thread Co., Ltd., 14 T.C. 725; Pasquel, 12 T.C.M. 1431; The Amalgamated Dental Co., Ltd., 6 T.C. 1009; European Naval Stores Co., S.A., 11 T.C. 127; R. J. Dorn & Co., 12 B.T.A. 1102.

As copartners of CADIC, Balanovski and Horenstein are taxable for the amount of partnership profits from sources within the United States under the statutory provisions cited above. The district court held them taxable only upon the "discounts" or "commissions" paid CADIC by the suppliers aft-

er completion of the sales transactions, not upon the total profits of the sales This solution of the problem is in seeming conflict with the usual rule that discounts received as inducements for quality purchasing are considered as reducing the purchasers' cost for tax purposes. See C. I. R. v. Bullock's, 9 Cir., 81 F.2d 1002. Further, isolation of the discount from the sales transaction is not in accord with preferred accounting technique. See, e.g., Paton, Essentials of Accounting 264–266 (Rev.Ed.1949). But see Finney, General Accounting 247–250 (1946). Isolation of the discount for tax purposes would be more appropriate if the court considered the partnership as a broker receiving commissions, rather than as a vendor. Cf. Simon v. C. I. R., 2 Cir., 176 F.2d 230. See Note, 69 Harv.L.Rev. 567, 568–569. But we need not consider whether the circumstances here justified the segregation for tax purposes of the discounts from the remainder of the sales profits— see G. A. Stafford & Co. v. Pedrick, D.C. S.D.N.Y., 78 F.Supp. 89, affirmed 2 Cir., 171 F.2d 42—for we hold the total profits on these transactions, including the discounts, to be taxable in full.

■ Under § 119(a) (6) and (e) [3] of the 1939 Code, a nonresident alien engaged in business here derives income from the sale of personal property in "the country in which [the goods are] sold." By the overwhelming weight of authority, goods are deemed "sold" within the statutory meaning when the seller performs the last act demanded of him to transfer ownership, and title

---

3. Internal Revenue Code of 1939:

"§ 119. Income from sources within United States

"(a) Gross income from sources in United States. The following items of gross income shall be treated as income from sources within the United States:

' .* * *· *· *

"(6) Sale of personal property. For gains, profits, and income from the sale of personal property, see subsection (e).

* * * * *

"(e) Income from sources partly within and partly without United States. Items of gross income, expenses,

losses and deductions, other than those specified in subsections (a) and (c) of this section, shall be allocated or apportioned to sources within or without the United States, under rules and regulations prescribed by the Commissioner with the approval of the Secretary. * * * Gains, profits and income derived from the purchase of personal property within and its sale without the United States or from the purchase of personal property without and its sale within the United States, shall be treated as derived entirely from sources within the country in which sold, * * *."

passes to the buyer. See East Coast Oil Co., S.A., 31 B.T.A. 558, affirmed C. I. R. v. East Coast Oil Co., S.A., 5 Cir., 85 F.2d 322, certiorari denied Helvering v. East Coast Oil Co., S.A., 299 U.S. 608, 57 S.Ct. 234, 81 L.Ed. 449; Amtorg Trading Corp. v. Higgins, 2 Cir., 150 F.2d 536, 539; G. A. Stafford & Co. v. Pedrick, supra, D.C.S.D.N.Y., 78 F. Supp. 89, affirmed without reaching the point, 2 Cir., 171 F.2d 42; Ronrico Corp., 44 B.T.A. 1130, 1136; The Exolon Co., 45 B.T.A. 844; Askania Werke, A.G., 33 B.T.A. 875, remanded for evidence, Askania Werke, A. G. v. Helvering, 68 App.D.C. 315, 96 F.2d 717; Elston Co., Ltd., 42 B.T.A. 208; Hazelton Corp., 36 B.T.A. 908; Tootal Broadhurst Lee Co., Ltd., 9 B.T.A. 321; Compania General de Tabacos de Filipinas v. Collector of Internal Revenue, 279 U. S. 306, 309, 49 S.Ct. 304, 73 L.Ed. 704; American Land & Investment Co. v. C. I. R., 4 Cir., 40 F.2d 336; Ardbern Co., 41 B.T.A. 910, affirmed on the point, Ardbern Co. v. C. I. R., 4 Cir., 120 F.2d 424; Briskey Co., 29 B.T.A. 987, affirmed C. I. R. v. Briskey Co., 3 Cir., 78 F.2d 816; Sabatini v. C. I. R., 2 Cir., 98 F.2d 753, 755.[4]

Here, by deliberate act of the parties, title, or at least beneficial ownership, passed to IAPI in the United States. Under the letters of credit, Balanovski was paid in the United States and CADIC's last act to complete performance was done here. When Balanovski presented evidence of shipment—the clean ocean bill of lading made out to the account of an Argentine bank with the directive "Notify IAPI"—he had completed CADIC's work and he received the final 1 per cent of IAPI's contract price.

The time when title to goods passes depends, of course, upon the intention of the parties. Amtorg Trading Corp. v. Higgins, supra, 2 Cir., 150 F.2d 536; 1 Williston on Sales § 259 (Rev. Ed. 1948); Uniform Sales Act § 18; N. Y. Pers.Prop.Law, McK.Consol.Laws, c. 41, § 99. When documents of title, such as a bill of lading, are given up, the presumption is that the seller has given up title, together with the documents. See N.Y. Pers.Prop.Law §§ 115, 156, 219; 2 Williston on Sales § 405 (Rev.Ed. 1948). In F.O.B. and F.A.S. contracts there is a presumption that title passes from the seller just as soon as the goods are delivered to the carrier "free on board" or "free alongside" the ship, as the case may be. See Amtorg Trading Corp. v. Higgins, supra, 2 Cir., 150 F.2d 536; Standard Casing Co. v. California Casing Co., 233 N.Y. 413, 135 N.E. 834; Nelson Bros Coal Co. v. Perryman-Burns Coal Co., 2 Cir., 48 F.2d 99; 2 Williston on Sales §§ 280b, 280h (Rev.Ed.1948); N.Y. Pers.Prop.Law § 100, Rule 5. Both of these presumptions, which would tend to establish that title passed from CADIC to IAPI in the United States, are not altered by the use of a letter of credit. See Briskey Co., supra, 29 B.T.A. 987, 991, affirmed C. I. R. v. Briskey Co., 3 Cir., 78 F.2d 816. Nor need we here consider whether more than "beneficial" title passed immediately to IAPI or whether a "security" or "legal" title rested with the intermediary bank. See McCurdy, Commercial Letters of Credit,

---

**4.** In 1947 the Bureau of Internal Revenue in G.C.M. 25131, 1947–2 Cum.Bull. 85, acceded to the "title passage" test as universally adopted by the courts, and revoked G.C.M. 8594, IX–2 Cum.Bull. 354 (1930), which had invoked a "place of contract" rule. Taxpayers here apparently do not claim reliance upon the latter ruling; nor would they have been entitled to rely upon it.

G.C.M. 25131, in addition to laying down the "passage of title" rule, provides in part as follows: "In any case in which the sales transaction is arranged in a particular manner for the primary purpose of tax avoidance, the foregoing rules will not be applied. (See Kaspare Cohn, Inc. v. Commissioner, 35 B.T.A. 646.) In such cases, all factors of the transaction, such as negotiations, the execution of the agreement, the location of the property, and the place of payment, will be considered, and the sale will be treated as having been consummated at the place where the substance of the sale occurred."

35 Harv.L.Rev. 715, 736; Thayer, C. I. F. Contracts in International Commerce, 53 Harv.L.Rev. 792, 821.

All the available evidence confirms, rather than rebuts, these presumptions of passage of title in the United States. All risk of loss passed before the ocean voyage. IAPI took out the marine insurance. CADIC performed all acts to complete the transaction, retained no control of the goods, and there was no possibility of withdrawal.

Judge Palmieri apparently did not contest that title to the goods passed in the United States. But he applied a test based upon the "substance of the transaction" to hold that Argentina was the place where the income-producing contracts were negotiated and concluded, the place of the buyer's business, and the destination of the goods. This led him to conclude that Argentina, rather than the United States, was the place of sale. The judge further buttressed this result by observing that IAPI, rather than CADIC, had insisted upon the passing of title in the United States.

Although the "passage of title" rule may be subject to criticism on the grounds that it may impose inequitable tax burdens upon taxpayers engaged in substantially similar transactions, such as upon exporters whose customers require that property in the goods pass in the United States—see Hearings before the House Committee on Ways and Means on Forty Topics Pertaining to the General Revision of the Internal Revenue Code, 83d Cong., 1st Sess., pt. 2, at 1458 (1953)—no suitable substitute test providing an adequate degree of certainty for taxpayers has been proposed. Vague "contacts" or "substance of the transaction" criteria would make it more difficult for corporations engaged in Western Hemisphere trade to plan their operations so as to receive the special deduction granted them if they derive at least 95 per cent of their income from sources outside the United States. Int. Rev.Code of 1954, §§ 921, 922; see also § 941. See Note, supra, 69 Harv.L.Rev. 567.

Careful study was given this problem by the experts working on the Income Tax Project of the American Law Institute. They did give consideration to an alternative test of "place of destination." But this was open to criticism on the ground that it unduly favored exporters. See Surrey & Warren, The Income Tax Project of the American Law Institute, 66 Harv.L.Rev. 1161, 1196–1198. After much deliberation the American Law Institute has retained the "title passage" rule in its 1954 draft of a model Internal Revenue Code. See American Law Institute, Federal Income Tax Statute, February 1954 Draft, vol. 2, § X906(c), and see comment at p. 483. Further, in substantially re-enacting § 119(e) (2) of the 1939 Code, Congress did not further define "the place of sale," thus apparently accepting the prevailing "passage of title" test. See Int.Rev.Code of 1954, §§ 861(a) (6), 862(a) (6).

■ Of course this test may present problems, as where passage of title is formally delayed to avoid taxes.[5] Hence it is not necessary, nor is it desirable, to require rigid adherence to this test under all circumstances. But the rule does provide for a certainty and ease of application desirable in international trade.[6] Where, as here, it appears to accord with the economic realities (since these profits flowed from transactions

---

5. See Dean & Leake, How To Arrange Foreign Sales So Title Will Pass "Outside the U. S." for Tax Purposes, 94 J. Accountancy 457.

6. Treas.Reg. 111, § 29.119–8, promulgated under § 119(e) of the Internal Revenue Code of 1939, provides that "the 'country in which sold' ordinarily means the place where the property is marketed."

The meaning of this definition is obscure, but surely we cannot construe it to mean the place of ultimate destination of the goods. Not only would such a construction be at variance with the decided cases, but it would make avoidance of American taxes not only simple but practically automatic.

engineered in major part within the United States), we see no reason to depart from it.[7] Hence we hold that the partners are liable for taxes on the entire profits of the partnership sales amounting to $7,763,702.20.

On the appeal of the defendant taxpayers the decision below is affirmed. On the appeal of the United States of America the judgment of the district court is reversed and the action is remanded for the entry of a judgment of recovery based upon a computation of taxes due in accordance with this opinion.

---

**7.** For discussions supporting the view taken in this opinion, see Note, 69 Harv. L.Rev. 567; 3 J.Taxation 43. On the general aspects of the problem, see 3 J. Taxation 113; 5 J.Taxation 111.