389 F.2d 590
 DRY CLIME LAMP CORPORATION and Henry S. Arnold, d/b/a
Consolidated Engineering Company and Futorian
Manufacturing Corporation of New York, Appellants,
v.
G. L. EDWARDS and James A. Hemphill, d/b/a Gulf Plastics
Company, Appellees.
 No. 23353.
 United States Court of Appeals Fifth Circuit.
 Jan. 29, 1968.
 
 George F. Woodliff, Jackson, Miss., Harold T. Ackerman, Birmingham, Ala., Don Hubert Wickens, Greensburg, Ind., for appellants.
 William A. Bacon, L. O. Smith, Jackson, Miss., for appellees.
 Before BELL and GODBOLD, Circuit Judges, and NOEL, District Judge.
 GODBOLD, Circuit Judge:
 
 
 1
 Gulf Plastics Company approached Consolidated Engineering Company, a manufacturers' representative specializing primarily in the sale of industrial heating equipment, and discussed its need for a mechanical finishing system in which to paint, bake and cure plastic and metal items. One of the several lines of components used in such systems and sold by Consolidated is custom-built radiant ovens manufactured by Dry Clime Lamp Corporation. In connection with sale of the various components sold by the manufacturers it represented Consolidated offers expert assistance and advice and will work with the customer in the layout of a complete system to serve his needs and will design and engineer the system.
 
 
 2
 Dry Clime holds itself out as expert in the heat processing field and in the manufacture of heat processing equipment. It has no sales force of its own but represents to the public through its brochures, one of which was furnished to Gulf by Consolidated, that its 'sales engineers' will come into the customer's plant and, using test equipment furnished by Dry Clime, gather essential data to enable Dry Clime to design scientifically the proper oven for the customer's needs. Dry Clime considered Consolidated to be one of its 'sales engineers,' and, under the contract with Dry Clime, Consolidated operates in an exclusive territory. Dry Clime furnished test equipment to Consolidated and authorized Consolidated to test the products customers were manufacturing or processing and to design and build ovens and systems that would meet the particular needs of respective customers and would include Dry Clime ovens as components. Dry Clime recognized that while its product was ovens a complete oven system required other components. Before dealing with Gulf, Consolidated had, for Dry Clime, designed oven systems that included Dry Clime's ovens.
 
 
 3
 The salesman and the proprietor of Consolidated each use two business cards. One card shows 'Consolidated Engineering Company' and the name of the individual. The other shows 'Dry Clime Lamp Corporation,' a drawing of the 'Dri Quik' mark, the name 'Consolidated Engineering Company' and the name of the individual bearer as 'Sales Engineer.'
 
 
 4
 Consolidated's representative came to the Gulf plant, ran tests, and after protracted negotiations and dealings procured from Gulf written purchase orders for the major components of a complete system for baking and curing small parts such as Consolidated was processing, including a Dry Clime infrared oven, a blower and paint spray booth from other manufacturers, and an electrical control panel to be assembled by Consolidated. Consolidated was paid no separate compensation for engineering and design. Its compensation was from commissions on the components it sold, including the Dry Clime oven. Consolidated engineered the system and prepared the overall drawings and specifications. At least one component was purchased elsewhere by Gulf, and one part of the system was built for Gulf by local labor at the suggestion of Consolidated. The purchase order for the Dry Clime oven, made by Gulf's acceptance of a written proposal on Consolidated's form, included this provision: 'GUARANTEE: All Dri Quik (the trade name of the oven) ovens carry a one year manufacturer's guarantee,' and the following: 'All previous agreements, guarantees and proposals covering equipment or service for this subject are hereby nullified.' There was testimony that the one year manufacturer's guarantee covered only defective parts and workmanship.
 
 
 5
 The components were installed and assembled so as to make up the system. It failed to bake and cure satisfactorily most of the plastic parts handled by Gulf. Repeated efforts, participated in by Consolidated, to make the system perform successfully were unavailing. Gulf sued Dry Clime and Consolidated[1] and after a trial without a jury was awarded damages of $20,000. The district court made detailed findings of fact and conclusions of law.
 
 
 6
 The evidence adequately supports the conclusion of the trial judge that both defendants breached an implied warranty of reasonable suitability of the technical custom-built system to perform its intended task. Consolidated was liable on the implied warranty arising from its oral undertaking to engineer, design, and supply drawings and specifications of the system, which it agreed to do in connection with its sale of the major components to be incorporated into the system. Dry Clime was liable as Consolidated's principal having, in the interest of selling its ovens as components of complete systems, given Consolidated actual authority to do the type of work and service which Consolidated here performed and having held Consolidated out as its 'sales engineer' to perform testing, engineering and design services for systems.
 
 
 7
 The express manufacturer's guarantee on the Dry Clime oven did not prevent an implied warranty of fitness on the system or limit the implied warranty to the narrower scope of the express warranty on the single component.1A Dry Clime could, and did, expressly guarantee this single item directly on its own behalf, which does not preclude it, as Consolidated's principal, from being responsible under the implied warranty on the system designed by its agent. The manufacturer's guarantee on a component of an assembled system is a familiar incident of business enterprise-- the added element in this case is that the manufacturer of the major component, by reason of authority given its agent, became responsible for suitability of the entire system. Nor did the disclaimer of warranty on the purchase order for the oven operate to prevent an implied warranty on the system. Mississippi gives effect to a non-warranty clause, but the disclaimer must clearly and unequivocally describe the warranties it disclaims, otherwise the seller has an unfair advantage. Grey v. Hayes-Sammons Chem. Co., 310 F.2d 291 (5th Cir. 1962). For the same reason the existence of the written guarantee on the oven alone did not by operation of the parol evidence rule bar testimony of negotiations, dealings and representations concerning the system as a whole. / 2/ The purchase order on the oven was not an integration of the agreement on the system.
 
 
 8
 Cases holding that in an executed sale with no fraud there is no implied warranty by an independet sales agent who is not a manufacturer, e.g. J. T. Fargason & Sons v. Cullander Machinery Co., 224 Miss. 620, 80 So.2d 757 (1955), have no application here. Consolidated's undertaking was not merely to sell components but also to engineer and design and furnish plans and specifications for the complete system of which the items sold would be parts. The implied warranty was to the quality of performance of the assembled system as designed and engineered by Consolidated.
 
 
 9
 The trial court was not plainly erroneous in finding that the nature and character of the equipment, under the circumstances of this case, did not make it a ratification for Gulf to continue the limited use of the system which it has been able to make. Gulf's offer to return the system was not accepted. The system had been incorporated into a new building and a conveyor set up to move items through it. There was no duty on Gulf to rip out a system the return of which was refused, or to re-route its conveyor, in order to prevent any use of the system.
 
 
 10
 The measure of Gulf's damage for breach of warranty is the difference between the purchase price of what was bought and the value thereof, plus special damages suffered as a natural and direct result of the breach of warranty. Morrow v. Barron Motor Company, 229 Miss. 51, 90 So.2d 20 (1956). A proper calculation of damages will include computing the cost of the components purchased from Consolidated and elsewhere, installation charges, delivery costs, and similar items, many of which were properly proved in the trial. From this must be deducted the fair market value. The testimony of Gulf was that the system has no value, and defendants produced no evidence to the contrary. However, Gulf's testimony was directed to value of the system to it in place as an operating entity and not the fair market value of the system or its components.[3] Consideration must be given to the expense of removing the system and selling it if not reflected in the market value.
 
 
 11
 Items of damages described as electrical services, electricity bills, paint, stripper material, cleaning and stripping costs and painting labor were not sufficiently proved. They were described simply as expenses that Gulf has incurred, with insufficient testimony, and for some no testimony, of relation to the system in question and its failure to perform.[4]
 
 
 12
 The attachment or garnishment in this removed case freezes the funds to make them available to answer the final judgment of the district court in the same manner as they would have been held to answer final judgment in the state court. 28 U.S.C.A. 1450.[5]
 
 
 13
 Dry Clime answered, admitting the garnishee was indebted to it but not stating in what amount. Consolidated and its salesman properly raised under Fed.R.Civ.P. 12 the defense of lack of jurisdiction, each contending that the garnishee defendants (then two in number-- one was dropped out of the case after it answered that it was not indebted to either defendant) were not indebted to them. After filing of affidavits and taking of depositions the court granted the motion to dismiss the salesman and denied the motion of Consolidated. Consolidated then answered, reasserting its contention of lack of jurisdiction and answering to the merits also. In its Conclusions of Law the court held:
 
 
 14
 The resident defendants have impounded in their hands in Mississippi funds in excess of the award herein due the principal defendants-- it matters not which one. Such funds may be condemned in the hands of said garnishees as the property of said defendants.[6]
 
 
 15
 The judgment for damages was joint and several against Consolidated and Dry Clime; against the garnishee the judgment was that the plaintiff recover the damages awarded with interest and costs, 'to be paid from the funds impounded and attached in this action to be applied in satisfaction of the judgment against (Consolidated and Dry Clime).'
 
 
 16
 This raises several problems. The order denying Consolidated's motion to dismiss was, presumably, on the ground that the garnishee defendant was indebted to Consolidated. However, the relations between Dry Clime, Consolidated and the garnishee defendant were re-explored in considerable detail at the trial. And there followed the cryptic Conclusion of Law that, 'it matters not which one' of the defendants the garnishee owed.
 
 
 17
 This leads to consideration of whether the court had jurisdiction and power to enter an in personam judgment against Consolidated, and if so the permissible limits of such judgment. We hold that in a removed case commenced in state court against a non-resident defendant by garnishment or attachment of a debt owed by a resident, which debt is wholly unrelated to the subject matter of the principal suit, if the non-resident defendant timely objects to in personam jurisdiction the court may not enter a judgment which operates against him in personam except insofar as it affects his interest in the funds garnished or attached, even though the non-resident defendant, after properly asserting his objections to jurisdiction, appears and contests the merits of the claim of the principal suit.[7]
 
 
 18
 The closest case is Salmon Falls Mfg. Co. v. Midland Tire & Rubber Co., 285 F. 214 (6th Cir. 1922), a removed case, in which $2,000 had been attached in state court. Defendant appeared and denied jurisdiction. Having lost on that it moved that the scope of the case be limited to the value of the property attached. This was denied and the plaintiff secured a verdict for more than $30,000. The court of appeals reversed, directing the judgment be amended to limit its satisfaction to the attached property and to show that the defendant was not bound as by a personal judgment. The district court for the Northern District of Texas applied the same principle in a removed attachment case in determining amount in controversy. Gershowitz v. Lane Cotton Mills, 21 F.Supp. 579 (N.D.Tex.1937).
 
 
 19
 The Restatement of Judgments 40 (1942), adopts the same view, pointing out the unreasonableness of subjecting the defendant to the dilemma of being deprived of his interest in property even though the claim against him may be unfounded or of submitting personally to the jurisdiction of a court which otherwise has no power over him. Id. comment a at 153-54. The Restatement position is that the judgment against the property is not binding on the parties personally by way of collateral estoppel. Id. comment a at 154.
 
 
 20
 The possibilities of unfairness in denying the right of limited appearance are especially manifest in situations in which the general-appearance practice is subject to serious abuse. For instance, when the value of the property is so small by comparison to the total personal claim that the plaintiff is obviously using the attachment merely as a handle to obtain personal jurisdiction otherwise available. * * *
 
 
 21
 Developments in the Law-- State-Court Jurisdiction, 73 Harv.L.Rev. 909, 954 (1960). In Salmon Falls the defendant appeared to defend its interest in $2,000 and was fastened with a judgment for more than $30,000. In the case at bar Consolidated has a $20,000 judgment against it, and what, if any, interest it has in the garnished property is not yet ascertainably determined. In Gershowitz, the attachment was of $1,800, the suit for $20,000.
 
 
 22
 One commentator suggests the denial of limited appearance is a violation of due process.[8]
 
 
 23
 In the case now before us, and in Salmon Falls and Gershowitz, there is no relation between the main claim and the property over which the court has obtained jurisdiction by reason of its situs, and there is no pre-existing lien. Even where property and claim are related, or there is a pre-existing lien, or both, the scope of in personam jurisdiction has been severely restricted. Most of the cases have arisen under the quasi in rem proceeding authorized by 28 U.S.C.A. 1655. That section authorizes three types of actions that may be prosecuted quasi in rem: actions to enforce liens upon property, actions to enforce claims to property, and actions to remove clouds from title. See Blume, Actions Quasi in Rem Under Section 1655, Title 28 U.S.C., 50 Mich.L.Rev. 1 (1957). Anderson v. Benson, 117 F.Supp. 765 (D.Neb.1953), appeal dismissed, 215 F.2d 752 (8th Cir. 1954), points out that the in personam portion of its order (directing non-resident defendants to execute transfer of bonds) did not go beyond the property over which the court had jurisdiction. Campbell v. Murdock, 90 F.Supp. 297 (N.D.Ohio 1950), was a suit to enforce a mechanic's lien on real estate within the territorial jurisdiction of the court. The court denied the motion to dismiss that portion of the action seeking a personal judgment against a non-resident owner of the property, holding that a personal judgment on the debt which gave rise to the lien was so clearly related to the in rem feature of the case, the foreclosure, that the court had jurisdiction.[9] The plaintiffs in McQuillen v. National Cash Register Co., 112 F.2d 877 (4th Cir.), cert. denied, 311 U.S. 695, 61 S.Ct. 140, 85 L.Ed. 450 (1940), sought in rem relief (chiefly the cancellation of corporate stock) and made in personam claims involving corporate affairs of the same corporation, with service under 1655. The court limited its jurisdiction to the in rem claims against the stock. Proctor v. Sagamore Big Game Club, 128 F.Supp. 885 (W.D.Pa.1955), was a suit under 1655 to try title to mineral rights of Pennsylvania land located in the judicial district, with in personam relief sought for money damages and an accounting. The court, accepting McQuillen as the better authority, held that an appearance to limit the jurisdiction to the in rem proceedings was not a general appearance. The court subsequently entered summary judgment for the defendants in the in rem proceeding. 166 F.Supp. 465 (W.D.Pa.1958), aff'd 265 F.2d 196 (3d Cir. 1959).
 
 
 24
 Professor Moore, 2A Moore, Federal Practice P12.13 (2d ed. 1967), disaproves of Salmon Falls. But he does so in discussion of, and in terms of, 1655, which was not shown by the report of that case to be involved.[10]
 
 
 25
 Of course, attachment creates a lien. But there is a difference between enforcement of a lien created by contract of the parties, with a full reach given to the court having jurisdiction of the property by reason of situs, and enforcement of the contingent and conditional lien of attachment, created by operation of law as a means of allowing a claimant to effect collection of an unrelated debt. Consent is not a definitive test of jurisdiction, only an aid to analysis-- but looking at it within that limited scope, consent may be implied to jurisdiction at the situs from a contractual lien relating to property, but one does not impliedly consent to the possible full reach of personal jurisdiction on the claim of X by the fact of being the creditor of Y in the same state on an unrelated transaction.[11]
 
 
 26
 An attachment case is not an action 'to enforce' a 'lien upon' property within 1655. Dormitzer v. Illinois & St. Louis Bridge Co., 6 F. 217, 218 (C.C.D.Mass.1881) (decided under Act of Mar. 3, 1875, ch. 137, 8, 18 Stat. 472, limited to equity cases but reading substantially the same as the first sentence of 1655); see Blume, supra at 709. As to the attachment and garnishment provisions of Fed.R.Civ.P. 64, see Davis v. Ensign-Bickford Co., 139 F.2d 624 (8th Cir. 1944).
 
 
 27
 In short, in a pure attachment case there is not between claim and property the sort of nexus contemplated by 1955. And even in the 1655 cases, where the nexus exists, the courts have by one means or another restricted the scope of personal jurisdiction or declined to recognize it to any extent.[12]
 
 
 28
 The district court had power to enter a personal judgment against Dry Clime. Dry Clime admitted the garnishee was indebted to it and did not contest or seek to limit jurisdiction of the court. We conclude that the court had no power to enter a judgment affecting Consolidated if it is found that Consolidated had no interest in the attached funds. If Consolidated had an interest in the funds judgment against it must be limited to the extent of subjecting that interest to Gulf's claim and can have no in personam effect.
 
 
 29
 It may be that the respective amounts of the interests of Dry Clime and of Consolidated, if any, are immaterial to Gulf, which upon redetermination of damages may be able to secure satisfaction of its judgment out of the attached funds without regard to which creditor's interest is being reached, and such respective interests may be immaterial to Dry Clime, Consolidated and the garnishee as well by reason of extra-judicial arrangements between them. But the respective interests are not immaterial as a matter of law to anyone concerned, and if any party desires determination and establishment thereof it is entitled to that in the district court.
 
 
 30
 The numerous other issues raised by appellants are either wholly without merit or are factual matters on which the trial court's findings are not plainly erroneous.
 
 
 31
 Reversed for redetermination of damages and for further proceedings not inconsistent with this opinion.
 
 
 
 [1]
 This is a removed case. Suit began in the Mississippi state court by attachment or garnishment directed to Mississippi residents alleged to be indebted to Dry Clime and Consolidated, nonresidents
 1A See Radalec, Inc. v. Automatic Firing Corp., 228 La. 116, 81 So.2d 830 (1955); Posey v. Pensacola Tractor & Equipment Co., 138 So.2d 777 (Fla.App.1962); cf. Stribling Bros. Mach. Co. v. Girod Co., 239 Miss. 488, 124 So.2d 289 (1960).
 
 
 [2]
 See generally & Williston, Contracts 643 (3d ed. 1961)
 
 
 [3]
 'The measure of the appellee's damages is the difference between the purchase price of the machinery and its value in the condition in which it was delivered to him. The evidence does not disclose what this value was. It simply discloses that the machine was of no value as a lighting plant. But it does not follow therefrom that the machinery was without any value at all.' J. B. Colt Co. v. Mazingo, 141 Miss. 402, 106 So. 533, 534 (1926)
 
 
 [4]
 We entertain considerable doubt of the sufficiency of testimony that 700,000 parts have been processed by other means but conveyed through the inactive system at an added cost of 1/2 cent each in additional work, producing a special damage item of $3,500, but we do not dwell on this, assuming that if this item is to be claimed it will be properly developed
 
 
 [5]
 Notwithstanding the provisions of Fed.R.Civ.P. 64 the federal district courts lack power to secure original jurisdiction over a non-resident defendant by attachment of his property within the district, Big Vein Coal Co. of West Virginia v. Read, 229 U.S. 31, 33 S.Ct. 694, 57 L.Ed. 1053 (1913); Davis v. Ensign-Bickford Co., 139 F.2d 624 (8th Cir. 1944); however, in a removed case in which there is no in personam jurisdiction but in rem jurisdiction has been obtained over property of the defendant before removal the plaintiff may obtain in federal court after removal such orders of attachment or garnishment against other property of the same defendant as would have been available to him in state court. Rorick v. Devon Syndicate, 307 U.S. 299, 59 S.Ct. 877, 83 L.Ed. 1303 (1939)
 
 
 [6]
 As already stated, the number of garnishees had been reduced to one
 
 
 [7]
 In most cases the non-resident defendant appears to defend his interest in property admittedly his and seeks to limit the court's jurisdiction to the extent of that property. Consolidated contested all jurisdiction on the ground the garnishee owed it nothing. By overruling Consolidated's Rule 12 motion the court appeared to conclude the garnishee owed Consolidated something, but there was no decision as to how much. In its answer Consolidated again insisted the garnishee owed it nothing and that there was no in personam jurisdiction. On these facts it was not necessary for Consolidated to come in with an alternative motion or defense that if the court found a debt to exist the in personam jurisdiction was to be limited to that amount
 
 
 [8]
 'These arguments seem to have overlooked the most compelling defense of the limited appearance, based upon the fact that the nonresident property-owner may not be deprived of his property without due process of law, and that due process necessarily involves the opportunity to appear and defend that property against the plaintiff's claim. While states which forbid the limited appearance have not deprived the defendant altogether of his right to protect the property, they have conditioned the exercise of that constitutional right upon his willingness to sacrifice an equally inviolable right, that of remaining immune from the personal jurisdiction of a state with which he had no substantial relationship. The general-appearance procedure thus seems to impose an unconstitutional condition upon the right to protect property from appropriation, and this imposition in turn renders the entire procedure offensive to basic constitutional tenets.' 73 Harv.L.Rev. at 954
 
 
 [9]
 While the court in a dictum suggests as a general proposition that if the defendant appears the court may try the entire controversy between the parties, the only cited authority is Bede Steam Shipping Co. v. New York Trust Co., 54 F.2d 658 (S.D.N.Y.1931), and the court recognizes that Bede lends itself to the interpretation that personal judgments must be limited to the in rem feature of the action which originally gave the court jurisdiction
 
 
 [10]
 Moore also cites with approval Grant v. Kellogg Co., 3 F.R.D. 229 (S.D.N.Y.1943), which had relied upon Moore. Grant is a removed attachment case with no pre-existing lien. Its conclusion is that the right of the non-resident defendant to subject himself to less than full in personam jurisdiction in a removed case is governed by state law because Rule 64, Fed.R.Civ.P., provides that such a case 'shall be prosecuted after removal, pursuant to these (federal) rules,' and Rule 12 does not allow a defendant to appear and participate in a substantial sense in the proceedings without submitting himself to unlimited in personam jurisdiction. We do not so understand Rule 12. The rule permits a defendant to raise separate defenses of lack of jurisdiction over the person and over subject matter, and no defense or objection is waived by being joined with another. The special appearance is abolished. The court can, as it did in McQuillen, respond to a motion raising the question of in personam jurisdiction by holding it has no such jurisdiction and then, having defined its jurisdiction, proceed to litigate the in rem matter before it. If the defendant (over whom the court has held it has no in personam jurisdiction) may not, as a claimant to the res before the court, in the in rem proceeding, make and prove his claim to the res without subjecting himself to a personal judgment reaching beyond his interest to the property, then the protections of Rule 12 procedures are stripped away
 
 
 [11]
 Gulf did not seek jurisdiction over Consolidated under any Mississippi long-arm statute. Miss.Code Ann. 1437-1438 (Supp.1966)
 
 
 [12]
 United States v. Balanovski, 236 F.2d 298 (2d Cir. 1956), was an action to foreclose a federal tax lien against partnership funds of two Argentines, held in American banks under jeopardy assessments. Jurisdiction was asserted under Int.Rev.Code of 1939, 3670 & 3678, 53 Stat. 448 & 450 and 28 U.S.C.A. 1655. The court held there was jurisdiction to enter personal judgments against the partners, who appeared to defend the property, for amounts greater than the seized funds. The rationale was, in part, that it would be futile to hold there was no personal jurisdiction because in future litigation the defendants would be bound by collateral estoppel or stare decisis, but this asserted reason assumes the answer to what is in issue. Compare Restatement of Judgments 40, comment a at 154 (1940). In any event Balanovski is a 1655 pre-existent lien case; also the court, as an alternative ground, held it was probable that there was personal jurisdiction by service of process on the defendants' New York agent