**P. W. DAVENPORT, Tax Collector for the City of Charlotte and Mecklenburg County, and City of Charlotte and Mecklenburg County, Appellees,**

v.

**RALPH N. PETERS & CO., a Limited Partnership, Appellants.**

**No. 11104.**

United States Court of Appeals Fourth Circuit.

Argued April 7, 1967.

Decided Oct. 12, 1967.

R. E. Cabell, Jr., Richmond, Va., and Thomas Ashe Lockhart, Charlotte, N. C. (Moncure & Cabell, Richmond, Va., and Cansler & Lockhart, Charlotte, N. C., on brief), for appellants.

Hamlin L. Wade, Charlotte, N. C. (Ruff, Perry, Bond, Cobb & Wade, Charlotte, N. C., on brief), for appellees.

Before HAYNSWORTH, Chief Judge, and BRYAN and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Whether a Chicago commodities broker (Ralph N. Peters & Co., a partnership, hereafter called "Peters") was properly before the Court and was correctly held personally liable for 1963 and 1964 personal property ad valorem taxes on cottonseed oil stored in Charlotte, Mecklenburg County, North Carolina, when, at most, it had only a security interest in the warehouse receipts, had repledged them for loans to itself, and the receipts were in the physical possession of bank which lent money to Peters, are the questions to be decided. The district court gave judgment against Peters for $22,-282.11. Davenport, Tax Collector v. Ralph N. Peters & Co., 274 F.Supp. 99 (W.D.N.C.1966). We reverse.

I

Detailed findings of fact, not contested by the parties on appeal, were made by the district judge. Only so much of them as are necessary for an understanding of the issues we decide will be restated.

Accommodating itself to a prescribed form which it had been furnished, Peters filed with the Tax Supervisor for Mecklenberg County a 1963 business personal property listing which disclosed that it had "Consigned Goods Carried As Part Of Your Inventory" of the value of $90,-558.00. Peters made no similar filing in 1964, but C. & T. Refinery, Inc. ("C. & T.") filed a business personal property listing in its own behalf in which it disclosed that there was stored in its tanks cottonseed oil having a value of $901,-302.00 "owned" by Peters. The "consigned" and the "owned" goods of Peters was all cottonseed oil initially refined and placed in its own tanks by C. & T., for its own account, but against which it issued negotiable warehouse receipts then sold by its own broker on the New York Produce Exchange.[1]

Peters, as broker, purchased some of the C. & T. warehouse receipts *for the account of Peters' customers.* Customarily, Peters would lend its customers the money to purchase the receipts and would hold the receipts as security for the repayment of the loan. Peters made such loans from its own funds or from funds borrowed by Peters from The Chase Manhattan Bank ("Chase"), in which event the receipts were held by Chase as security for the repayment of the loan by Peters. Peters did *not* buy or sell warehouse receipts for its own account, or borrow money to finance such transactions. On January 1, 1963, and January 1, 1964, respectively, the warehouse receipts allegedly "owned" by Peters were physically in the possession of Chase to secure loans made by Chase to Peters, the proceeds of which were lent by Peters to its customers.[2] In North Carolina, personal property is assessed "in accordance with ownership and value as of the first day of January each year." N.C.G.S. § 105–280.

Peters, as shown by the books of C. & T., was the owner of the warehouse receipts (50, issued in 1962 and 95, issued

---

1. A single warehouse receipt represents a tank car, i.e., 60,000 pounds, of cottonseed oil.

2. The district judge so found in his formal findings of fact. In his memorandum decision, the district judge stated that on these dates physical possession of the receipts was in Peters *or* Chase, and the opinion stated that in the event of a discrepancy the recapitulation and summary in the memorandum decision should control. However, our examination of the record fails to disclose any factual basis to support the conclusion that the receipts were in the physical possession of anyone other than Chase on the date of assessment. Plaintiffs, in their brief, treat Chase as having physical possession of the receipts on the dates in question.

in 1963) which it bought for its customers, and Peters was billed for monthly storage charges, which it paid. Peters, however, billed its customers for a pro-rata share of the storage charges. The warehouse receipts, once issued and once endorsed by C. & T.'s broker, were fully negotiable, with or without further endorsement, by delivery.

During 1963 and 1964, there were approximately 2,000 warehouse receipts for cottonseed oil outstanding in the United States (200 of which were issued by C. & T.), and there were in excess of 100 brokers, and from 50 to 100 refinery companies dealing in them. Dealings in warehouse receipts were not confined to full receipts but were also carried on in fractional interests therein. During 1963, there were between 1,000 and 2,000 transactions in these receipts, or interests therein, *daily*. There was no practicable way of knowing who was the ultimate owner of the stored oil from time to time.

## II

The action to collect taxes assessed was commenced March 2, 1964, by a complaint which, *inter alia*, prayed the issuance of an order of attachment against 145 tank cars (8,700,000 lbs.) of cottonseed oil in the hands of C. & T. allegedly the property of Peters, and an injunction against the transfer by Peters or Chase of 145 negotiable warehouse receipts therefor.[3]

North Carolina law permits original attachments against non-residents and foreign corporations, N.C.G.S. § 1–440.3, and Rules 4(e) and (f), Fed.R.Civ.P., authorize a district court to provide for service of process in accordance with a statute of the state in which the district court is held, even beyond the territorial limits of the state. Because North Carolina law does not permit an attachment against property in the possession of a warehouseman who has issued a negotiable warehouse receipt therefor, unless

the receipt is first surrendered or its negotiation enjoined, N.C.G.S. § 25–7–602 (formerly N.C.G.S. § 27–25), plaintiffs sought and obtained, *ex parte*, an order of attachment and a temporary restraining order enjoining Peters and Chase from negotiating the 145 warehouse receipts. Thereafter, a consent order was entered which, among other things provided for dissolution of the attachment and the temporary restraining order upon the filing of a bond in the penal sum of $25,000.00 to assure payment of the liability "if any" of Peters and Chase. The consent order recited and provided:

> "Mr. Cabell [ultimately counsel of record for Peters and Chase] states to the Court that at the time any such bond is filed he will be authorized by the defendants to enter a personal appearance and will do so. Counsel discussed and are concerned with the in rem basis of the Court's jurisdiction and by this agreement intend that the in rem basis of jurisdiction will not be defeated by reason of the substitution of a bond and the release of the attached property.

> "Nothing contained herein is intended to, or shall be construed to be a waiver of any other legal defense available to the defendants and it is their contention that there is no tax liability upon them."

The bond was filed April 13, 1964, and the property released.

By their answer, filed May 4, 1964, Peters and Chase admitted that C. & T. held oil for the account of Peters and, specifically, that Peters owned 95 of the warehouse receipts issued by C. & T., but they vigorously denied liability for any tax on numerous grounds. Discovery, primarily at the instance of the plaintiffs, ensued; and the facts concerning the issuance of warehouse receipts and the manner in which they were dealt in being developed, Peters and Chase, on February 11, 1966, filed an amended an-

---

**3.** Jurisdiction was founded on diversity of citizenship and the amount in controversy. Named as defendants were Peters, Chase and C. & T. The suit against C. & T. was not pressed after a bond was filed to release the goods and, ultimately, Chase was given judgment in its favor. Neither appealed.

swer in which they denied that Peters was the owner of any of the 145 warehouse receipts on the day of finality for either 1963 or 1964 taxes, as alleged in the complaint.

The trial of the action began June 1, 1966, on which day the taking of evidence was completed; argument was postponed until a later date. Fully developed was the fact that Peters and Chase had only a security interest in the warehouse receipts, as we have stated and as set forth in the detailed findings of the district judge. In the light of such facts, Peters and Chase supplemented the denial of ownership in their amended answer by filing, on September 2, 1966, a motion for summary judgment and for dissolution of Chase's bond, previously filed to release the attachment. Plaintiffs countered with an amendment to the complaint alleging that if Peters and Chase were not the owners of the property attached, they, or either of them, had a duty to report the property for taxation for the years 1963 and 1964, failing which they were personally liable for payment of the taxes, interests and costs to the date of payment. Liability on the part of Peters and Chase was thus asserted under N.C.G.S. § 105–317 which, in pertinent part, reads:

"[A]ll brokers dealing in tangible personal property who have in their possession such property belonging to others, shall file with the supervisor of taxation of the county in which such property is located a full and complete list of the owners of such property, together with the amount of such property owned by each * * * [B]rokers failing to make such reports shall be liable to payment of the tax * *."

Carefully alleging that they appeared specially and not generally, Peters and Chase moved to dismiss the action alleged in the amended complaint for lack of jurisdiction by the court over them. Their motion alleged that a new and radically different cause of action was alleged against them in the amended complaint, changing the original cause of action from an *in rem* to an *in personam* proceeding, that they were non-residents of North Carolina and had not made a voluntary appearance before the court in respect to the amended complaint, and that their only appearance was in regard to the original *in rem* proceeding.

The case was argued and submitted to the district court on all points at issue on September 12, 1966.

### III

So far as pertinent to this appeal, the district court ruled that neither Peters nor Chase owned either the warehouse receipts or the oil at the time of attachment and, therefore, the attachment was erroneously ordered and the bond should be dissolved. The district judge deemed the appearance of Peters and Chase in the proceeding a general one and, although he was of the view that the better rule was that they did not thereby waive their right to contest the court's jurisdiction over them, he held that they were estopped to deny jurisdiction because of the lateness of the time in which it was asserted and because of intervening prejudice to plaintiffs in trying to determine the correct taxable owners. Rejecting Peters' and Chase's argument that plaintiffs should not be permitted to amend their complaint to allege an additional (and inconsistent) cause of action based on N.C.G.S. § 105–317, supra, the district court held Peters liable for the tax, on the theory that it had "possession" of the cottonseed oil, and exonerated Chase because it was not a "broker" within the meaning of § 105–317.[4]

### IV

In this appeal, the parties do not question the district court's determination that under the facts and law, neither Peters nor Chase was the owner of the warehouse receipts or of the oil they

---

4. Not pertinent to this appeal, the district judge also decided that the cottonseed oil had a tax situs in Mecklenburg County, North Carolina, on the two relevant tax days and that the imposition of the tax did not constitute an invalid levy on interstate commerce in violation of the Commerce Clause.

represented. The correctness of the judgment against it is challenged by Peters on the grounds that plaintiffs, who now concede that their original action *quasi-in-rem* was ill-founded, should not have been permitted to amend their complaint to allege an action *in personam* against Peters. Next, Peters contends that if the amendment of the complaint was proper, Peters had the right to contest *in personam* jurisdiction over it, that it was not estopped to deny jurisdiction and that jurisdiction did not exist. A third contention is that in any event, under the facts of record, Peters was not includable in the classification of "brokers dealing in tangible personal property who have in their possession such property belonging to others," which are required to report the owners thereof, failing which they are personally liable, as provided in § 105–317.

## V

■ The federal policy of liberality in permitting amendments to pleadings, as embodied in Rule 15, Fed.R.Civ.P., is self-evident. Within the discretion of the trial judge, "Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues [issues not raised in the pleadings but tried by express or implied consent of the parties] may be made upon motion of any party at any time, even after judgment * * *." Rule 15(b). Rule 15(a) also directs that leave to amend "shall be freely given when justice so requires."

Relying, however, on the doctrine that amendments to complaints can be made only if the effect is neither to enlarge nor to restrict federal jurisdiction, Peters contends that it did not submit itself generally to the jurisdiction of the district court when it appeared to dissolve the attachment, when it filed an answer and amended answer and when it went to trial, and that it has not been served with process, *and could not be served with process*, in the *in personam* cause of action under § 105–317, alleged in the amended complaint so that jurisdiction *in personam* does not exist over it. Sup-

port for this contention may be found in Falls Industries, Inc. v. Consolidated Chemical Industries, Inc., 258 F.2d 277 (5 Cir. 1958); Phillips v. Murchison, 194 F.Supp. 620 (S.D.N.Y.1961); Lasch v. Antkies, 161 F.Supp. 851 (E.D. Pa.1958); Maya Corp. v. Smith, 32 F.2d 350 (D.Del.1929). See also, Freeman v. Bee Machine Co., Inc., 319 U.S. 448, 63 S.Ct. 1146, 87 L.Ed. 1509 (1942); International Ladies' Garment Workers' Union v. Shields & Company, 209 F.Supp. 145 (S.D.N.Y.1962); 3 Moore's, Federal Practice, ¶ 15.02[2] pp. 815, et seq.

We turn, therefore, to the question of whether Peters submitted itself to *in personam* jurisdiction of the district court. While plaintiffs do not challenge the correctness of the legal proposition advanced by Peters, they argue that Peters did submit itself generally to the jurisdiction of the court, or, alternatively, that Peters is estopped to deny jurisdiction. We conclude that neither argument is meritorious.

■ Peters did not respond to the attachment by a "special" appearance but, since the advent of Rule 12(b), Fed.R. Civ.P., the distinction between general and special appearances in federal practice has been abolished. "There is no longer any necessity for appearing specially, as subdivision (b) provides that every defense may be made either in the responsive pleading or by motion. * * The familiar aphorism that the filing of an answer to the merits involves an appearance for all purposes, is still valid but quite worthless for any practical use since all objections to jurisdiction, venue and process and all defenses in abatement or bar may be set up in a motion or answer to the merits without waiving any of them." 1A Barron and Holtzoff, Federal Practice and Procedure (Wright's Ed.) § 343, pp. 284–286. See also, 2A Moore's, Federal Practice, ¶ 12.-12.

The question of whether the appearance of a claimant in a proceeding *quasi-in-rem*, who is unsuccessful in defending the *in rem* action, subjects himself to *in personam* jurisdiction for liability in ex-

cess of the value of the *res* has caused a conflict between the circuits. In the leading case of Salmon Falls Mfg. Co. v. Midland Tire & Rubber Co., 285 F. 214 (6 Cir. 1922), it was held that the appearance [5] of a claimant who unsuccessfully contested the *in rem* action on the merits did not subject him to personal jurisdiction, the Court being impressed with the unfairness of a rule that a claimant could deny personal jurisdiction only by surrendering its defense to a recovery to be satisfied only out of the attached property. Conversely, in United States v. Balanovski, 236 F.2d 298 (2 Cir. 1956), the Court held that defendants' appearance in and unsuccessful defense on the merits of an action *quasi-in-rem* subjected them to jurisdiction *in personam*. The Court based its decision in large part on the practicalities of the situation, namely, that the parties could not complain of inconvenience, since they were within the jurisdiction, that the contrary rule would result in additional litigation if the parties were found within the United States, in which event the parties would lose on the merits by collateral estoppel or *stare decisis,* and that hence " * * * a rule against personal jurisdiction would be merely a mandate for further fruitless litigation." Id., p. 302. The Court in *Balanovski* noted the numerous decisions resolving the question in conflicting ways throughout the federal courts.

Our own decision in McQuillen v. National Cash Register Co., 112 F.2d 877 (4 Cir. 1940), although treated in the opinion in the *Balanovski* case as being in accord with the decision in the *Salmon Falls* case, seems to occupy a middle ground. In that case the district judge, in an action *in rem* granted a motion striking all matters in the amended complaint sounding *in personam* and limited the claims of the plaintiffs to the value of the *res,* where the defendants had not been personally served and only appeared specially as claimants to the *res.* This Court quoted with approval the language of the trial judge:

> " 'Parties may appear specially, without their actions in so doing being construed as a general appearance, provided such special appearance, of course, is made seasonably, that is, before the one so appearing has done anything with respect to meeting the merits of the case which would amount to a waiver of, or, in fact, an estoppel against the right to assert that the special appearance was not actually a general appearance.' " Id., pp. 881–882.

Of course, it should be noted that both the *Salmon Falls* and *Balanovski* cases dealt with the question of personal jurisdiction over a claimant in an *in rem* proceeding *when the claimant's defense to the in rem proceeding was found lacking in merit.* It is not readily to be supposed that if the claimant's defense in the *in rem* proceeding is meritorious and he has not otherwise entered a general appearance, or been served personally, that any question of jurisdiction *in personam* over him could arise. Indeed, the opinion in the *Balanovski* case prefaces the entire discussion as to whether an unsuccessful claimant in an *in rem* proceeding, who has not been personally served may be held liable *in personam* in excess of the value of the *res,* saying, "Since the defendants appeared and defended on the merits, the court acquired power to render a judgment *in personam* conditional only upon the validity of the original *quasi-in-rem* jurisdiction." Id., 236 F.2d p. 302. Speaking of the affect of a defense on the merits in a *quasi-in-rem* action, 1A Barron and Holtzoff, supra, § 370.1 states that the traditional view was that a defense on the merits did not subject defendant to a personal judgment (citing the *Salmon Falls* case, supra, as the leading case), but adding that more recent cases are to the contrary (citing *Balanovski* as a leading case typical of

---

5. The claimant appeared "specially" but the case, of course, arose before the adoption of Rule 12(b).

recent decisions). The author then states:

"As the Balanovski case makes clear a defendant who attacks jurisdiction at the same time as he defends on the merits does not waive his objections to the validity on the quasi-in-rem jurisdiction. *If that jurisdiction is bad, the entire proceeding must fall.* But if that jurisdictional challenge is overruled, the court must go ahead, try the merits, and give a personal judgment on the entire claim. This view, supported by the most recent authority, seems clearly sound." (emphasis supplied) Id., p. 534.[6]

The district judge, following the concept expressed in the *National Cash Register* case (although he made no reference thereto), considered that the question before him was whether Peters was estopped, by reason of its failure to make the objection to *in personam* jurisdiction over it promptly and its delay of twenty-three months before making it, from asserting lack of jurisdiction after the property had been released and the restraining order dissolved. In holding that Peters was so estopped, the district judge rested his conclusion on the possibility that if Peters had disclosed in the spring of 1964 that it did not own the warehouse receipts representing the oil which had been attached, the true owner or owners might then have been ascertained, and he or they might have been the same on the date of filing the complaint as on the tax dates of January 1, 1963 and 1964.

■ Peters, promptly after out-of-state service of the notice of the attachment, appeared to release the attachment. We do not think that the statement in the consent order that if the attachment

were released counsel for Peters would be authorized to enter a personal appearance and would do so, or the additional language, manifestly designed to preserve the court's *in rem* jurisdiction over the substituted property (the bond), was sufficient to submit Peters generally to the jurisdiction of the court.

In its original answer, Peters admitted ownership of 95 of the 145 warehouse receipts alleged to be outstanding, but, at the same time, Peters denied the liability of the oil, against which the receipts had been issued, for taxation on numerous grounds, including the general denial that any taxes, or any part of the taxes, assessed were due from Peters to the plaintiffs. Additionally, it cannot be overlooked that the oil that was attached was alleged to have a market value of slightly under $1,000,000.00, and that the tax claim sought to be enforced was only in access of $18,000.00, including interest and penalties. There was, thus, at that time, little ground for Peters to believe that *in personam* jurisdiction would be asserted against it.

While the delay on the part of Peters of twenty-three months to make as part of the formal pleadings its denial of ownership of the warehouse receipts representing the oil stored with C. & T. is inexplicable, we do not agree that Peters was thereby estopped to make such denial and that Peters' contest on the merits of the attachment, which, under the authorities previously discussed, it could carry on without subjecting itself to *in personam* jurisdiction, was transmuted into a general appearance giving the district court jurisdiction, without personal service, over Peters in a cause of action under § 105–317.

---

6. As the 1967 supplement to the text reveals, C. S. Foreman Co. v. H. B. Zachry Co., 127 F.Supp. 901 (D.Mo.1955) (opinion by Judge, later Justice, Whittaker) is in accord. See also, George v. Lewis, 204 F.Supp. 380 (D.Colo.1962). Contra is Canaday v. Superior Court, 10 Terry 456, 119 A.2d 347 (Del.1955), but we agree with the commentator that this result is " * * * contrary to one of

the principal purposes of the rules, and thus the federal decisions to the contrary are clearly preferable." Id. (1966 Pocket Part), p. 86.

In the instant case, the district judge commented that "the better rule" was that Peters did not waive its jurisdictional objection by defending the attachment on the merits.

■ Established notions of estoppel require a holding out by one party on which another party relies *to his detriment*. In the instant case, detriment to plaintiffs would lie in their failure or inability to collect taxes from the person or persons liable therefor, because Peters gave them to believe that it was the owner of the receipts. Since it was established that the warehouse receipts issued against the oil sought to be taxed were being freely traded in New York, Chicago and elsewhere and, hence, in the hands of non-residents, plaintiffs could collect such taxes only by non-resident attachment. But by the law of North Carolina such an attachment would be permissible only if the holder or holders of all outstanding receipts were enjoined from transferring the same. Only if the person liable for the tax and the holder of the receipt at the time that an attachment was laid were one and the same could a valid attachment be laid; because, manifestly, a holder, not the owner on the tax date, could not be enjoined from transferring the certificate since he would not be liable for taxes.[7]

Thus, detriment to plaintiffs, as impliedly recognized by the district judge, was suffered only if the owner of the 50 receipts on January 1, 1963 and the owner of the 145 receipts on January 1, 1964, were the owners thereof on March 2, 1964, the date that the district judge enjoined their transfer. The record in this case fails to establish any reasonable likelihood that the crucial congruence of ownership existed even if plaintiffs had been seasonably advised that Peters was the owner on all of the dates in question. On January 1, 1963, as shown by Peters' records (i. e., the name of the person paying storage charges), the 50 warehouse receipts issued in 1962 were owned by Allied Crude Vegetable Oil Refinery Corporation ("Allied"), a refiner of cottonseed oil. On January 1, 1964, these 50 receipts, as well as the 95 receipts issued in 1963, according to the same records of Peters, were owned by Fats and Oils Export Corporation ("Fats and Oils"). Thus, unless Allied held the receipts for Fats and Oils, or for a person person or persons, the identity of whom is not shown of record, and in the latter event Fats and Oils held the receipts for the same unknown person or persons, plaintiffs would be unable to attach the 50 warehouse receipts.

As to the 95 receipts, the record shows that Fats and Oils was a broker, which held the receipts for the account of one or more of its customers, the identity of whom was unknown to Peters. The record further shows that there was an active market in warehouse receipts, and interests therein, participated in by brokers and refiners and, indeed, that there were between 1,000 and 2,000 transactions in these receipts, or interests therein, *daily*.[8] To the extent that the 145 receipts, or interests therein, were traded, Peters would not be advised, or have knowledge, of the ultimate owners.

■ We conclude that up until the time that plaintiffs amended their complaint, Peters had not subjected itself to *in personam* jurisdiction, that it seasonably contested *in personam* jurisdiction

---

7. Under N.C.G.S. § 105-241, a lien for state taxes on personal property is not enforceable against a bona fide purchaser for value, except upon a levy upon such property under an execution or a tax warrant; but when a tax lien is perfected, it is, by N.C.G.S. § 105-376(c), superior to all other liens or rights prior or subsequent in time. By N.C.G.S. § 25-7-502(c) (formerly N.C.G.S. § 57-41) a bona fide purchaser of a warehouse receipt acquires good title against a lien senior in time of which the purchaser had no notice. Cf., Commercial National Bank of New Orleans v. Canal-

Louisiana Bank and Trust Co., 239 U.S. 520, 36 S.Ct. 194, 60 L.Ed. 417 (1916). Thus, an enforceable lien on the oil would not arise until it was executed on; but it could not be attached when a warehouse receipt therefor was in the hands of one who purchased it not knowing of the lien.

8. Corroboration is supplied by an examination of the 145 receipts which were admitted in evidence. Although once endorsed by C. & T.'s broker, they were negotiable without further endorsement, most of them show a myriad of undated endorsements.

by motion when such jurisdiction was alleged, that it was not estopped to contest such jurisdiction, and that *in personam* jurisdiction, for lack of personal service, did not exist. It follows that the district court erred in permitting plaintiffs to amend their complaint, to assert *in personam* jurisdiction over Peters, and in ruling that Peters was estopped to deny *in personam* jurisdiction.

## VI

As a separate and alternative basis for reversal of the judgment below, we conclude also that even if *in personam* jurisdiction existed over Peters, or if Peters were estopped to deny *in personam* jurisdiction, Peters was not liable under § 105–317 under the facts of record.

■ For § 105–317 to render Peters liable, it must be established that Peters was a broker dealing in tangible personal property which had in its "possession" such property belonging to others and, further, that Peters failed to report the owners of the property and the amounts of their property in accordance with the statute. Peters was a broker[9] and Peters did not file the required report, but we conclude, under the facts of record, that Peters did not have "possession" of property belonging to others.

Even if it is assumed that possession of a negotiable warehouse receipt constitutes possession of the stored commodity, the district judge found, and his finding is fully supported by the record, that physical possession or custody of the receipts was in Chase. Peters had no right to exercise any dominion or control over the receipts while they were in the hands of Chase; its only right was to require redelivery of the receipts by repaying the moneys which Chase had lent to Peters. Upon repayment of the Chase loans and redelivery of the receipts, Peters would have only a security interest in the receipts. Again, it would have no right of dominion or control over the receipts, unless and until its customer defaulted on the loan made by Peters for which certificates had been pledged. Upon the happening of that event, Peters would have the right to foreclose on its security.

■ "Possession" is a word ambiguous in meaning; it is not capable of exact definition because its definition varies according to the context in which it is used. National Safe Deposit Co. v. Stead, 232 U.S. 58, 34 S.Ct. 209, 58 L.Ed. 504 (1914); Boyd v. Travelers Fire Ins. Co., 147 Neb. 237, 22 N.W.2d 700 (1946). It is quite true, as plaintiffs contend, that the definition of "possession" in the North Carolina sales and use tax law, as stated in Watson Industries v. Shaw, 235 N.C. 203, 69 S.E.2d 505 (1952), cannot blindly be applied to § 105–317.[10] Indeed, when § 105–317 is considered in its entirety,[11] its basic legislative purpose would seem to be to require a disclosure by certain persons having a connection with and knowledge of property of others so that the property may be taxed and

9. Although it is unnecessary for us to pass on the question, § 105–317 might be read as limited to a broker having possession of property belonging to others *in his capacity as a broker.* Strictly speaking, a broker is one who acts as negotiator between buyer and seller. Hence, a broker having possession of property of others is an anomaly and more nearly describes a factor rather than a broker. If the strict definition of broker is read into the statute, Peters was not a broker having possession of property belonging to others in its capacity as a broker. Peters' interests in the receipts arose after the sale of them was completed by reason of the moneys which Peters lent to finance the purchase. Peters was thus in the same position as Chase, which all of the parties concede was correctly exonerated.

10. The opinion in *Watson Industries* speaks of "possession" as meaning the right to exercise power over property at pleasure and to the exclusion of all others. Section 105–317 must mean something less because it speaks of possession of property *"belonging to others."* Unfettered dominion and control over the property cannot thus be vested in the possessor.

11. Section 105–317 also requires reports by persons having "possession of property on consignment" and, by amendment made in 1965, reports by operators of parks or storage lots "renting or leasing space for three or more house trailers or mobile homes".

state and local tax revenues protected. "Possession" should accordingly be given a broad and general meaning; yet we are not at liberty to ignore the choice of language selected to accomplish that purpose.

■■ The *Watson Industries* case is an aid to decision because it recognizes that "custody," which is something less than possession, and "possession" are not convertible terms and, further, that it is part of the law of North Carolina, as it is generally elsewhere, that in cases of doubt, taxing statutes are construed most strongly against the government and in favor of the taxpayer. We have considerable doubt that Peters had custody of the tangible personal property in the tanks of C. & T. on January 1, 1963 and January 1, 1964, respectively, since it did not own or hold the receipts and had only a conditional right to obtain them. We have no doubt that Peters did not have "possession" either of the receipts or the oil they represented on the dates in question. We conclude, therefore, that Peters cannot be liable under § 105–317 for failure to report the identity of the owners, together with the amount of such property owned by each.

Reversed.