In the Matter of **AUTOMATED BOOK-BINDING SERVICES, INC., Bankrupt.**

No. 14537.

United States District Court,
D. Maryland.
Jan. 12, 1972.

Charles G. Page, Clarke Murphy, Jr., and White, Page & Lentz, Baltimore, Md., for petitioner.

Louis J. Sagner, Baltimore, Md., for respondent.

BLAIR, District Judge.

This dispute arises out of the bankruptcy of Automated Bookbinding Services, Inc. (hereinafter Bankrupt) in early 1971 and is before the court on a petition for review of an order entered by Referee Joseph O. Kaiser on June 2, 1971.

The issue is which party has a superior claim to a bookbinding machine or the proceeds from the sale thereof where both parties have recorded financing statements in Maryland.

In April 1971, Hans Mueller Corporation (hereinafter HMC) filed an application in the bankruptcy proceedings to reclaim a Hans Mueller Heavy Duty Perfect Binder and accessory units (the new binder) which it had earlier sold to and installed for Bankrupt pursuant to a purchase and security agreement. Finance Company of America (hereinafter FCA) intervened in the proceedings and claimed a superior interest in the new binder under its own security agreement with Bankrupt. The trustee in bankruptcy has disclaimed any interest on the part of Bankrupt in the new binder.

In his Memorandum Opinion of June 2, 1971, the referee found that the FCA claim to the new binder as after-acquired property was superior to the purchase money security interest of HMC in the collateral. By his Order of the same date, he allowed FCA to reclaim the new binder, dissolved an injunction restraining its sale, permitted FCA to proceed with a non-judicial sale, and ordered that the proceeds from the sale of the new binder be held by FCA pending review by the district court.

After hearing arguments of counsel on December 16, 1971 and considering the memoranda, records, documents, and other evidence transmitted by the referee, the court now holds for the

reasons hereinafter set forth that the referee's conclusions are in error.

## I.

The controlling historical facts and sequence of events are not in dispute. They are:

1. On November 20, 1968, to secure an obligation owed to FCA, Bankrupt executed a chattel mortgage security agreement covering all chattels and equipment of Bankrupt listed on an attached schedule. A financing statement was properly filed in Anne Arundel County, Maryland on November 21, 1968, covering property "presently existing or to be hereafter created or acquired" as well as the proceeds of the collateral therein described.

2. On January 30, 1970, Bankrupt and HMC entered into a purchase and security agreement for the new binder involved in this dispute. It called for a cash purchase price of $84,265 plus an installation charge of $2,160 for an aggregate sales price of $86,425. It further provided for a down payment in cash at the time of the order of $6,442.50, cash before delivery in the amount of $6,442.50, a trade-in allowance of $22,000, leaving a balance of $51,540. The trade-in provided for in the contract was Bankrupt's Sheridan binder (the old binder).

3. Fifteen cases of component parts for the new binder were shipped from Europe and arrived in New York on May 18, 1970 under a negotiable bill of lading to the order of Rohner, Gehrig & Co., shipping agents for HMC.

4. By HMC's invoice to Bankrupt dated May 22, 1970 and following Bankrupt's second payment of $6,440, the component parts of the new binder were identified to the contract by particular description and serial numbers. The HMC invoice also called for cash pay-ment of $51,562.50 on completion of installation.

5. On instructions from HMC, the shipper Rohner, Gehrig & Co. directed Hemingway Transport Inc. to pick up the fifteen cases of binder component parts from dockside in New York and to deliver them to Bankrupt in Maryland. These cases as well as two other cases transported from HMC's plant by Hemingway, all containing component parts for the binder, arrived at Bankrupt's plant on several dates from May 26, 1970 through June 2, 1970.

6. The purchase and security agreement between HMC and Bankrupt dated January 30, 1970 contained among its provisions the following:

"The installation charges mentioned herein include the furnishing by the Seller of a competent man to supervise the erection and put said property in first class running order, and the instruction of a qualified operator of Purchaser in the operation and maintenance of the equipment."

Pursuant to this provision, several representatives of HMC were at the Maryland plant of Bankrupt supervising installation of the new binder on virtually all working days from May 27, 1970 through June 19, 1970. It is clear from the records in evidence that the installation and testing phase of the work was completed not earlier than June 13, 1970 and possibly as late as June 19, 1970. HMC's representatives were engaged in training employees of the Bankrupt to operate the new binder at least during the period June 8, 1970 through June 13, 1970.

7. On June 15, 1970, HMC filed a financing statement in Anne Arundel County covering the new binder.[1]

8. On June 18, 1970, the Bankrupt signed a certificate stating that delivery and installation had been satisfactorily completed.

---

1. HMC's financing statement incorrectly names the debtor as "Automated Bindery Services, Inc." It is not seriously contended that this "minor error" made the filing of the financing statement defective, nor does it appear that such contention would be supportable. Art. 95B Ann.Code of Md. (1957, 1964 Repl. Vol.) § 9-401(1) and (5); see Plemens v. Didde-Glaser, 244 Md. 556, 224 A.2d 464 (1966); In re Excel Stores, Inc., 341 F.2d 961 (2d Cir. 1965).

## II.

■ Since Maryland is the forum for the bankruptcy proceedings and since the collateral was destined for and then used in business in Maryland, the conflict of laws rules of Maryland govern here. *See* Casterline v. General Motors Acceptance Corp., 195 Pa.Super. 344, 171 A.2d 813, 815–816 (1961); *cf.* Industrial Packaging Products Co. v. Fort Pitt Packaging International, Inc., 399 Pa. 643, 161 A.2d 19 (1960).

■ The purchase and security agreement between HMC and Bankrupt contained the following provision:

"LAW APPLICABLE: The Uniform Commercial Code in effect in the State of New York shall govern the rights, duties and remedies of the parties and any provisions herein declared invalid under any law shall not invalidate any other provisions of this agreement."

Although New York law might arguably control in a controversy between HMC and Bankrupt, those contestants cannot successfully agree to bind creditors, such as FCA, who were not parties to their agreement. In re Kokomo Times Publishing and Printing Corp., 301 F.Supp. 529, 536 (S.D.Ind.1968).

However, even if FCA were subject to the aforementioned HMC-Bankrupt provision, the law of Maryland would nonetheless apply. Maryland enacted the Uniform Commercial Code, effective in 1964, as Article 95B Annotated Code of Maryland. In all particulars important to the issues to be resolved in this case, the provisions of the Code enacted by New York and Maryland are identical.

Under § 1–105, parties are free to choose the law they wish to govern the transaction. However, this provision of the Code contains several exceptions, among which are transactions to which § 9–102 and § 9–103 apply. The latter exception, § 9–103(3), is one of the provisions of the Code which is controlling in this dispute.[2] In pertinent part, it reads:

"If personal property other than that governed by subsections (1) and (2) is already subject to a security interest when it is brought into this State, the validity of the security interest in this State is to be determined by the law (including the conflict of laws rules) of the jurisdiction where the property was when the security interest attached. However, if the parties to the transaction understood at the time that the security interest attached that the property would be kept in this State and it was brought into this State within thirty days after the security interest attached for purposes other than transportation through this State, then the validity of the security interest in this State is to be determined by the law of this State."

Under the facts of this case, the term "this State" means Maryland. Accordingly, the court concludes that the law of Maryland, with one exception to be later noted, governs in this case as indeed the contestants seem to have concluded at the outset. Subsequent section references in this opinion are to the Uniform Commercial Code in effect in Maryland, unless otherwise indicated.

2. The Section 9–103 exception is further explained in the official comment to Section 9–102:
"3. In general this Subtitle adopts the position, implicit in prior law, that the law of the state where the collateral is located should be the governing law, without regard to possible contacts in other jurisdictions. Thus the applicability of the Subtitle is by this section stated to extend to transactions concerning 'personal property and fixtures within the jurisdiction of this state'. This 'narrow' approach, appropriate in the field of security transactions, should be contrasted with the 'broad' approach stated in Section 1–105 with reference to the applicability of the Act as a whole. Section 9–103 states special rules relating to the applicability of this subtitle where the collateral consists of certain types of intangibles or mobile equipment, or property which is brought into this state subject to a security interest which attached in another jurisdiction."

### III.

As a reviewing body, this court is bound to accept the referee's findings of fact unless clearly erroneous. General Order of Bankruptcy No. 47.

In Piedmont Minerals Company v. United States, 429 F.2d 560, 562 n.4 (4th Cir. 1970), Chief Judge Haynesworth set out the circumstances for which the "clearly erroneous" rule would not bind the Court of Appeals in reviewing a district court's findings of fact (made pursuant to Rule 52(a), Fed.R.Civ.P.):

> "To be sure, in making this determination of fact the district court must apply relevant legal principles, and a factual determination made in disregard of the applicable principles of law, or made through gross overemphasis on one relevant principle to the exclusion of others, will be reversed because of the application of an improper legal standard."

This guideline is likewise appropriate for the district court's review of the holdings of a referee in bankruptcy.

This stricture does not apply, however, when the issue is the application of legal standards to undisputed facts. For purposes of this review, it is clear that the operative facts are not in dispute and the "clearly erroneous" doctrine does not limit the court in its consideration of the referee's decision.

### IV.

Does HMC have priority in its claim to the new binder over FCA by virtue of its filing a financing statement on June 15, 1970?

Section 9–312(4) provides:

> "A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within ten days thereafter."

"Possession," the key word here, is not defined in the Uniform Commercial Code.

Indeed, as a court has observed in a different area of law, possession "is not capable of exact definition because its definition varies according to the context in which it is used." Davenport v. Ralph N. Peters & Co., 386 F.2d 199, 208 (4th Cir. 1967). Thus to determine when Bankrupt came into possession of the new binder, it is necessary to review the facts in light of the applicable law.

The new binder was a relatively complicated and expensive piece of equipment. It arrived at Bankrupt's plant in seventeen cases of component parts with an approximate gross weight of thirteen tons. Final assembly was to be done on site. The cash purchase price was $84,265 plus an installation charge payable to the vendor of $2,160. These facts, without more, would strongly suggest that both parties contemplated more than mere delivery of the seventeen cases before HMC came into possession of the new binder it had bargained for. Such a suspicion standing alone, however, would not be determinative.

The following provisions relating to purchase and installation prices and the manner of payment appear in the purchase and security agreement:

| Purchaser agrees to pay Seller: | | |
|---|---|---|
| Cash Price | | $84,265.00 |
| Installation (exclusive of rigging, hoisting and electrical wiring) | | $ 2,160.00 |
| Sales Tax | | $ |
| Total Sales Price | | $86,425.00 |
| Less down Payment: | | |
| Cash with order | $ 6,442.50 | |
| Cash before delivery | $ 6,442.50 | |
| Cash on completion of installation | $ | |
| *Trade In* | $22,000.00 | |
| | $ | |
| | $ | |
| | $51,540.00 | |
| Total: | | $86,425.00 |
| Leaving balance of: | | $ |
| Carrying charges | | $ |
| Total Time Balance | | $ |

The agreement was a form contract which contained time balance and installment payment provisions, none of

which were filled in for this transaction. Payment of the balance purchase price of $51,540 was either to be made upon the completion of installation as HMC contends or at an unspecified time as FCA contends. To this court, the only reasonable construction of the payment provisions is that the agreement called for the balance of $51,540 in cash upon completion of installation of the new binder. Although the figures "51,540" were not entered immediately opposite the printed notation "Cash on completion of installation," they were entered in the last of the blank spaces under this category. The reason for the place of entry is self-evident. Another figure—$22,000—representing part payment of the purchase price by trade-in of certain equipment had to intervene in order to arrive at the proper balance payable in cash. Since there was no category on the printed form for *Trade In,* these words were typed onto the form at the point where the allowance for the trade-in was arithmetically indicated.

Such a construction of the payment provisions gains added support when the provision concerning installation is considered. While it is clear that Bankrupt was to bear the cost of installation—partly as cost in its agreement with HMC and partly as direct expense—there is no doubt that HMC had a substantial and definite obligation extending through the installation phase. The important passage of the installation provision reads:

> "The installation charges mentioned herein include the furnishing by the Seller of a competent man to supervise the erection and put said property in first class running order, and the instruction of a qualified operator of Purchaser in the operation and maintenance of the equipment."

Although not controlling, the construction that the parties to the agreement placed upon it prior to the present dispute is worthy of note. By its invoice to Bankrupt dated May 22, 1970, HMC identified the goods to the contract by serial number and restated the payments set forth in the purchase and security agreement. The notation on the invoice reads "$51,562.50 cash on completion of install." Such a notation on a valid business record is clearly supportive of the construction this court has given the agreement.

A consideration of all factors leads the court to conclude that the agreement between HMC and Bankrupt, properly construed, obligates HMC to provide and install specified equipment, place it in first class running order, and train an operator.

Tender of delivery is an essential step in transactions falling under the U.C.C. §§ 2–503 and 2–507. Under these facts, and in the absence of any evidence of waiver, HMC was in no position to tender delivery under its agreement until the equipment had been assembled, placed in first class running order, and an employee of Bankrupt had been trained as an operator. Acceptance by the buyer is the next step in the transaction following tender of delivery. § 2–606. It is manifest from the language of this section that acceptance by affirmative action or by failure to reject does not occur until the buyer has had "a reasonable opportunity to inspect" the goods.

The installation and testing of the new binder was completed no earlier than June 13, 1970 and possibly as late as June 19, 1970. Formal written acceptance, although not called for in the agreement, occurred on June 18, 1970. As the Court of Appeals of Maryland has held in a similar case:

> "[T]he delivery of the generator to the job site, while identifying the goods to the contract, did not amount to a delivery of goods or the performance of obligations conforming to the contract. It could not constitute such a delivery and performance until the generator had been installed, started up, and field tests completed to the satisfaction of the government."

William F. Wilke, Inc. v. Cummins Diesel Engines, Inc., 252 Md. 611, 618, 250 A.2d 886 (1969). *See also* Brodie Hotel

Supply, Inc. v. United States, 431 F.2d 1316 (9th Cir. 1970).

■ Accordingly, this court holds that tender and acceptance of what the parties had bargained for in their purchase and security agreement occurred no earlier than June 13, 1970 and that possession of the new binder within the meaning of the U.C.C. vested in Bankrupt no earlier than that date. It follows that by filing a financing statement on June 15, 1970, HMC perfected its security interest in the new binder. The perfection having occurred within ten days of possession, HMC is thus entitled to priority over the security interest of FCA. § 9–312(4).

### V.

The preceding section of this opinion assumed that HMC had not perfected a security interest in the new binder prior to its delivery to Bankrupt in Maryland. HMC argues that it had a perfected security interest before the new binder left New York. The court agrees with this contention.

The referee held that § 9–312(4) was controlling on this question. Having so concluded, he was apparently guided by the official comment to that section:

"3. . . .

The perfection requirement means that the purchase money secured party either has filed a financing statement before that time or has a temporarily perfected interest in goods covered by documents under Section 9–304(4) and (5). . . ."

The interpretation of the referee would make the alternatives of the comment exclusive ones, thus precluding any other means of perfecting a security interest in the binder under these facts. The court cannot agree with this conclusion.

Section 9–303(1) clearly indicates that a security interest may be perfected in other ways:

"A security interest is perfected when it has attached and when all of the applicable steps required for perfection have been taken. Such steps are specified in §§ 9–302, 9–304, 9–305

and 9–306. If such steps are taken before the security interest attaches, it is perfected at the time when it attaches."

■ In this case a security interest attached in favor of HMC while the binder was in New York. Under § 9–204 (1), three requirements are necessary for a security interest to attach: 1) there must be agreement that it attach (§ 1–201(3)), 2) value must be given (§ 1–201(44)), and 3) the debtor must have rights in the collateral. The HMC-Bankrupt security agreement satisfies the first two requisites, and when the new binder's component parts were identified to the contract, the Bankrupt acquired limited rights in the machinery. §§ 2–501(1) (b) and 2–401(1). Thus, HMC's security interest attached on May 22, 1970.

Since HMC was in possession of the binder's component parts at the moment of attachment, HMC's security interest was then perfected under the law of New York. § 9–305. Perfection under such circumstances does not depend upon the filing of a financing statement. § 9–303(1). Under the court's holding heretofore made, possession continued in HMC at least until June 13, 1970, and during that period of possession HMC's security interest in the binder continued perfected. § 9–305.

■ When the binder in its component form was transported to Maryland in late May 1970, the intended two state transaction came into being. Once property is brought into the second state, § 9–103(3) is the appropriate section to look to. In re Dennis Mitchell Industries, Inc., 419 F.2d 349, 357 (3rd Cir. 1969).

Section 9–103(3) provides:

"If the security interest was already perfected under the law of the jurisdiction where the property was when the security interest attached and before being brought into this State, the security interest continues perfected in this State for four months and also

thereafter if within the four months period it is perfected in this State."

See also § 9–303(2) and official comment 2. The four month grace period is explained in the official comment 7 to § 9–103(3). Its purpose is to impose a time limit for the accommodation of both a secured party who needs time to follow the collateral into the second state and for other creditors of and purchasers from the debtor who reside in the state of destination.

██ Once HMC no longer had possession of the binder, HMC was obliged to perfect its purchase money security interest in Maryland within a given time in order to retain a superior claim to the collateral. Under § 9–103(3), HMC had at least until September 1970 to do so in order to prevent its security interest from becoming unperfected at the end of the four month period. In re Dennis Mitchell Industries, Inc., supra; Annot., 30 A.L.R.3d 9, Construction and Effect of U.C.C. Art. 9, § 37 "Incoming goods subject to a security interest," (1970).

When HMC filed its financing statement in Maryland covering the new binder on June 15, 1970, that filing gave HMC a continuously perfected security interest superior to FCA's after-acquired property interest. § 9–103(3).

## VI.

Alternatively, FCA claims it is entitled to $22,000 out of the sale of the new binder as "proceeds" resulting from the trade-in allowance made for the old binder. § 9–306.

While not mentioned by the referee in his Memorandum Opinion, this argument is nonetheless entitled to consideration in view of the court's holding on the other issues before it. Under General Order No. 47, "the reviewing judge is not barred from considering any issue presented by the record, even though it was not discussed by or before the referee." 2 Collier on Bankruptcy § 39.28 (14th ed.); In re Dunn, 251 F. Supp. 637, 639 (D.Ga.1966).

Since the record discloses a contention before the referee over the trade-in provisions and both sides have directed portions of their briefs to this point, the court believes it unnecessary to remand the issue to the referee for further proceedings.

In the new binder purchase agreement, Bankrupt was to transfer to HMC "the complete title to [the old binder] free of all liens and encumbrances." Bankrupt could not have complied with this undertaking because FCA, at all times, held as against HMC a superior security interest in the old binder.

From the record of proceedings before the referee, the following facts appear: 1) the old binder was dismantled shortly before the new binder arrived at Bankrupt's plant; 2) Bankrupt's president directed that the old binder be disassembled to make room for the new binder; 3) HMC neither participated in the disassembly of the old binder nor exercised any dominion or control over it after its disassembly; 4) HMC has never asserted any rights to the old binder after discovering that FCA had prior perfected security interest; and 5) FCA assumed dominion over the old binder and included it in the advertisement for sale of collateral authorized by its security agreement with Bankrupt.

██ Under these facts, the court holds that HMC has neither interfered with nor taken possession of the old binder which was part of the collateral security for debts due from Bankrupt to FCA. It follows that there are no proceeds within the meaning of § 9–306 which should be allowed to FCA.

## VII.

For the foregoing reasons, the Order of the referee allowing the claim of FCA and denying the claim of HMC is reversed. HMC has the superior claim to the proceeds from the sale of the new binder.